Good morning. I think the way we're hoping to divide our time is I'll argue for 20 minutes on both appeals, the Orloff and the Hardenbrook appeals, and then Mr. Anderson will argue for five minutes on the attorney fees issue in the Hardenbrook appeal, and I'd like to reserve five minutes for rebuttal. Thank you. May it please the court, counsel for UPS. My name is Eric Rossman. I'm an attorney with UPS. I represent Mr. Orloff in this case, who is the appellant in his case against UPS, and I represent Mr. Hardenbrook in his case where he is the appellee in UPS's appeal of that case. Since 19... I will argue the Orloff case first and why Mr. Orloff, I submit to the court, should have his day in court and should have been granted the right to have his day in for wrongful termination where the motivation for the termination violates the public policy of the state. In this case, there's no dispute that an important public policy was at issue, the reporting of federal hours of service regulations. In this case, there was no dispute that there was a genuine issue of material fact that the motivation behind the decision to demote Mr. Orloff two levels within the company was his failure to suppress reports of hours of service violations. Was motivation sufficient? Don't you have to also show causation? Yes, you do have to show causation, and I believe we had more than sufficient evidence to demonstrate causation in the case, and I don't think that was a basis for the district court's decision to grant summary judgment. His decision to grant summary judgment was that Mr. Orloff was not... did not make the report and was not aware of the report at the time, despite the fact that he had sufficient evidence to demonstrate that the motivation for his demotion was his failure to suppress the reports. And so the court really drew the esoteric distinction in that the court said, well, there hasn't been a case where a person has been demoted for failing to suppress the conduct or the report, and that that's not conduct sufficient to warrant a claim. And I would submit that if the Idaho Supreme Court had addressed this issue, the Idaho Supreme Court would have considered that to be a logical extension of the case that the court said then. I'll ask you the same question we asked the previous counsel. Would you advocate that we certify that issue to the Idaho Supreme Court? Well, I wouldn't advocate it, but I certainly understand that's his court's right. But what the district court's obligation to do, and I think what the court of appeals should do, as set down by prior cases in this court of appeals, is the court is obligated to first attempt to predict or approximate what the Idaho Supreme Court would do if faced with this issue. And if the court comes to the realization that it can't do so, or it doesn't have sufficient information or enough direction to do so, then I think certification is appropriate. But I think in this case, the district court and this court very well could approximate, based on prior decisions, what the Idaho Supreme Court would do if faced with this issue. I'm having trouble following your argument. I understand perfectly well when the person is fired because he exercised a right, and it was public policy not to exercise a right. In California, that came out in Tammany v. Richfield. He wouldn't testify falsely to the grand jury, and they fired him. I understand that. But here, what action did Orloff take, which is guaranteed him by public policy? He didn't take any action. Right. Well, I would submit to the court that refusing or failing to suppress the report is every bit as important to the public policy as would be making the report itself. Because what he was demoted for in the statement that was made to him as to one of the reasons he was demoted was he failed to control his people, specifically Mr. Hardenbrook and Mr. Orloff. And I have a hard time drawing a distinction, and I think the Idaho Supreme Court would have a very difficult time drawing a distinction, between a report and a failure to suppress a report. Because the message to employers, under the public policy exception to the at-will doctrine, should be don't violate the public policy. Rather than, you're free to make any employment decision you want to make, as long as you don't discharge the employee, and as long as the employee isn't the one making the report. So instead of punishing the reporter, punish the supervisor. You're sending the same message to your staff. You're sending the same message to your employees. And I would submit that a distinction between this case and Mr. Hardenbrook's case, for example, would be putting form over substance. Because what they're doing is exactly the same. They're punishing employees for exercising a protected legal right. Whether he makes the report, or whether he fails to suppress the report, it still would further the public purpose, if a cause of action were recognized. And I think what you're saying is that you're, the theory is that if they punish him for not muzzling protected activity of his subordinates, that that's, he's engaging in protected activity. Is that the general idea? Yes. Okay, now, what's the Idaho case that's closest to supporting that? I would say it's Thomas v. Medical Center Physicians. That's 61 P. 3rd. And specifically at page 565 of that opinion, the court said an employee who reports wrongful conduct, that is protected under the public policy exception, is protected by that reporting, or by reporting that conduct to supervisors within the company. I would submit it as a logical extension of that statement in that case, that the failure to suppress the report is just as important to protect in furthering the public policy as the making of the report itself. And I don't think it's an expansion of Idaho law. I think it is a logical extension of Idaho law. And if you were to approximate what the Idaho Supreme Court would have done with that issue, I would submit to this court that the Idaho Supreme Court would have recognized that distinction. The idea and the focus behind the Idaho Supreme Court decisions has always been the motivation of the employer. If you look at every one of the cases, the public policy exception applies where the motivation of the employer is to suppress the protected conduct. And in this case, the motivation is exactly the same in Robert Orloff's two-level demotion as it was in Daryl Hardenbrook's termination. What is the best case you have from Idaho that a demotion is the same as a termination? Well, unfortunately, the Idaho Supreme Court has never addressed that issue or anything close to that issue. It hasn't been asked to decide whether anything short of a discharge would give rise to a public policy claim. But again, I would submit to this court that that is putting form over substance. And I think the Kansas Supreme Court stated it well when it did address the issue in Brigham v. Dillon Companies, Inc., 935 P2D 1054. The employer in that case, the only argument that has ever been raised as to why a demotion should be different than a discharge is, oh boy, you're going to open the floodgates to litigation every time an employee gets a bad performance review. Well, I would submit that, first of all, if we look at the Title VII cases, there aren't a lot of cases where people claim retaliation for bad performance review. They're typically discharge or serious employment activity. But secondly, the Kansas Supreme Court said, will you not share the employer's concern that a torrent of litigation of insubstantial employment matters would follow in the wake of our recognition of a cause of action for retaliatory demotion? And if we did, it does not constitute a valid reason for denying recognition of an otherwise justified cause of action. And I would submit to the court, again, that that is exactly as I would submit the Idaho Supreme Court, based on its prior decisions, would address this issue. The focus is on the motivation and the protection of the public policy. And so the message to employers is simply this, don't violate the public policy. Rather than, you're free to violate the public policy as long as you discharge, or as long as you demote, rather than discharge your employee. Are you going to talk about Hardin Rocks? Absolutely. And so with You can concentrate on one issue. Absolutely. Hardin Rock got an award for the value of his restricted stock options had he remained in employment and had not been terminated. It varied between $250,000 and $500,000, depending on whether one assumed that he would have been promoted further, right? Now, it seems to me that the issue of the present value of that award, this $250,000, 10 years away, was never really dealt with by the plaintiff's expert. What he was talking about was the probable yield of an investment in the stock of UPS, the cost of capital versus the probable yield. He got about half a percentage point, or a percentage and a half. And he said, you might as well call it zero. He never really dealt with the present value. Isn't that violative of the Idaho law, which is very similar to California's law, regarding present valuation as a discount of the total amount to be awarded in the future? I would submit to you, Judge Baeth, that Idaho, the Idaho Supreme Court has been, I would submit, fairly restrictive or relaxed as it relates to the discount, present value determination. That's not what the instruction, the Idaho pattern instruction is exactly that. The present value of money is something less than the ultimate award will be over the years, right? Exactly. That's not what your expert did. Well, I would submit that I think he did. And what he did is he wanted to know what the present value of this future stream of money is going to be with this particular company. And so what he did is he looked at, what's the future stream of money? Ten years from now, UPS stock will be worth so much based on what it was worth over the last two years. That sum is such and such. $250,000 if he doesn't get promoted, $500,000 if he does get promoted. $250,000 ten years from now, what sum of money will reach $250,000? That's the present value. He never did that computation. He was talking about cost of capital. That's the borrowing cost, right? And this yield. Those are two different calculations completely. Why should we remand this to the district court to say, district court, you had some doubts about whether the present value evidence was good. He voiced them. Now, give voice to those doubts and make a new finding on it. Number one, I would submit that it was the defense burden to prove present value, but more importantly. All right. Counsel, if I could ask you a question just on that point. I thought we just got a 28 J letter with an Idaho Supreme Court case that said that determining present value is to show damages. It did in that particular case. That's the Watkins case, Your Honor. And if you look at that case closely, the court was not saying in all contract cases, the plaintiff's burden is to prove the present value of the future stream of money. What it said was in that case, the plaintiff's burden, one of its elements, has set out in the contract, the lease itself. It specifically called for, in the liquidated damages provision, the present worth of the future stream. And the court said that language is the same as present value. Therefore, under the contract, the plaintiff was obligated to prove the present worth of that future stream in his case in chief. But it's not part and parcel of a plaintiff's burden always is to prove damages, right? We cited a lot of cases to the court in our briefing in this case that demonstrated that the plaintiff is obligated to point on his evidence. And we did offer a qualified expert to render a present value determination of the future stream. And he did that with what we submit to be consistent and solid economic theory that was never challenged with a Daubert motion, was never challenged with a motion to exclude. We didn't have the opportunity for those rates for really the first time on appeal. And they never produced anything, any evidence, any testimony, any publications, any studies, anything that would demonstrate that Mr. Reinstein's opinions were not scientifically reliable. The jury was properly instructed, the jury received the present value instruction, and yet the jury still awarded the front pay through retirement. And there was an EIDL Supreme Court case, I wish I could cite the case to you, it's in my head, it's just on the tip of my tongue, where the plaintiff didn't offer any evidence on present value. And the court, and I'll try to find it. It looks like the jury was not too happy with UPS. I would agree with you, Your Honor. And that lends itself to the punitive damages argument on the Orloff appeal that I think the jury should have been entitled to hear in the Hardenbrook case and should be entitled to hear in the Orloff case. You keep an eye on your time. Yes, at five minutes, I think I have to turn it over to him. Well, no, I think, no, that's all yours. We set the starting clock at 20 instead of 30. All right. So your colleague would get five, and you'd still have five for rebuttal. Thank you. And secondly, I guess the last point on the discount rate issue is, Your Honor, I think what the court really recognized, yes, the court had some concerns about Mr. Reinstein's development of the discount rate. But unfortunately, opposing counsel really didn't put on any evidence. They put their own economists on the stand, and really all he did was say, I'm going to use a 10 to 12% discount rate because Mr. Reinstein used that in some prior report. That report was not put into evidence. He didn't explain how that discount rate was developed. And the only indication that he gave as to where he got it was doing the same thing Mr. Reinstein did, but he limited his analysis to the previous 10 years that UPS was a publicly traded entity. Well, unfortunately, that previous 10 years started in 1999 when the economy was at its peak, and UPS stock rode out the downturn in the economy. So it's certainly understandable why if you just look at that piece of time, you'd have a 10 to 12% discount rate. The other real challenge that opposing counsel or that UPS has put to the Hardenbrook ruling or the Hardenbrook decision is the front pay term. I would submit to the court that UPS is not arguing that the district court applied an improper legal standard or that the jury was improperly instructed in some way. What they're arguing is that the district court weighed the evidence improperly. In Anderson v. Bessemer, the U.S. Supreme Court, in 470 U.S. 564, 1985, said that if the district court's account of the evidence is plausible, taking into account the entire record, the court of appeals must not reverse it, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. And the point I would make again and again on the Hardenbrook appeal is, as we talk about front pay through retirement, a judge who sat through the trial and listened to the evidence agreed with the jury and awarded a lifetime of front pay. Counsel, what do we do with the fact that the back pay seems to have been included in the front pay? That's a very good question, and I wish I had some direction from the court as to what happened there. I think what happened is... But it appears that both counsel agree that this was a mistake, but you disagree as to how it ought to be corrected. I can't argue with that. So is there anything for us to do but send it back to the district court? Is there anything that's so clear here that this panel ought to resolve this without having to remand it? I think you can remand it to $40,000, but I certainly would understand that the court may feel justified in remanding it to the district court to tell us what... Because UPS is arguing that it should be remanded for $149,000, so I assume that you still want to argue over the remaining $109,000. My point is what the jury did is they used the entire Scenario 2 that our expert laid out in determining their front pay award. Yes, that included back pay, but the jury said, we're going to put that in as front pay, and then we're going to add $40,000 to it as back pay. What the district court did is the exact same thing, but he took Scenario 1 instead of Scenario 2. And so I would submit to the court that the obvious intention of the district court was to not unduly interfere with the jury's verdict or the jury's determination, but to do the same thing they did, but to convert it to Scenario 1 as opposed to Scenario 2. We're sort of guessing as to what the district court did, aren't we? Somewhat. Okay. And so the two main challenges that UPS posits as it relates to the front pay is the term of the front pay, allowing it to retirement, and number two, whether or not mitigation occurred, whether or not Mr. Hardenbrook reasonably mitigated and therefore stopped his front pay. On the front pay term, I would submit to the court that the Idaho Supreme Court has never said that front pay damages as a matter of law cannot extend to the age of retirement depending on the evidence in the case. In fact, the Idaho Supreme Court has specifically addressed what is appropriate front pay for the jury in a breach of contract case, specifically a public policy case as this was. And the court said any damages, and that was O'Dell v. Visabe, any claim of damages for prospective loss contains some element of uncertainty, but that fact is not fatal to recovery. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created. And the court said the jury may make a just and reasonable estimate of the damage based upon relevant data and render its verdict accordingly. Every case opposing counsel's side to this court is a federal case involving either FMLA or ADA or Title VII. And in those cases, as this court knows, the judge is the finder of fact on front pay. It's an alternative to reinstatement, and the judge makes the decision as to what is an appropriate front pay in those cases. So any of those that have come to the Ninth Circuit have been appellants asking the court to review the lower court's decision for an abuse of discretion on whether or not he committed clear error in rendering that front pay decision. Well, we've got another level here. In Idaho, front pay is a jury question. And a unanimous jury said the term of his front pay should extend through retirement. There was substantial evidence to support it. And the judge read that, and he agreed. Or at least he didn't think that it was so erroneous to overturn that ruling. And so I would submit to the court that there was substantial evidence, as opposed to the cases that opposing counsel cited. In this case, there was substantial evidence to support the fact that UPS was a unique employer, exclusively promoted from within. As the judge said, every witness that testified in the case testified that most managers stay employed until retirement because of the compensation and benefits UPS provides. And I think if you look at that compensation, it's uncomparable to most, if not any other company. And if you look at the Battery Systems case that opposing the UPS argues was, or the Battery Systems employment that they argue was comparable employment, I would submit it was not comparable employment. There was no room for advancement, as Mr. Hardenbrook's supervisor testified. No salary increases, no bonus opportunity, no promotion opportunity, no retirement plan, no retirement health care, no management incentive compensation in cash or stock, as UPS had. The jury was entitled to a fine. I see I'm out of time. I'll let Mr. Anderson argue. Thank you. Mr. Anderson. Good morning. May it please the court, my name is Tyler Anderson. I represent Darrell Hardenbrook, who's in court here with us today. I want to talk about one issue, and that is whether the district court erred in refusing to award his attorney's fees after he secured a substantial verdict and a judgment in excess of $700,000 against his former employer, UPS. Our central point here is that the district court erred by using the results of the co-plaintiffs in the case to justify its conclusion that Mr. Hardenbrook was not a prevailing party. What's most puzzling about the district court's analysis, the excerpts of record, page 42, it said that had Mr. Hardenbrook sued separately, he would have, quote, been declared the victor, end quote, and the court concluded that thought by stating he would have been awarded his attorney's fees. Counsel, if we were to agree with you, does this have implications for Mr. Orloff, who doesn't appear to be represented in this? It may net out in terms of what UPS gets and pays, but the pockets from which it goes to and from which it comes from are going to be very, very different on the plaintiff's side. I think that's right, and I think that's why I'm here in place of Mr. Rossman, because the position that we are advancing is that the court is to look at each plaintiff individually as it relates to UPS. So the implications are, if Mr. Hardenbrook is entitled to attorney's fees, Mr. Orloff may owe UPS attorney's fees? He may, depending on how the prevailing party shakes out, which, again, is why I'm here in place of Mr. Rossman, so he's not pulled in both of those directions. And so really the only explanation for lumping the parties together was that they sued together, and that's what holds the district court's decision together in place in this case. After it concludes that if Mr. Hardenbrook sued separately, he would have been entitled to fees, there's no justification for denying fees. That's the abuse of discretion. That result is not an exercise of reason, and it's not a policy argument that we're advancing. It's going to invite multiplication of the proceedings. The next time Mr. Rossman will file three suits instead of one, and I suppose the clerk may collect an extra fee, but that's about where the benefit to the judiciary will end. We're going to have multiplication of the proceedings. And the way the district court got there was it applied the wrong legal framework. It applied a framework that exists where a claim and a counterclaim is advanced, and the reason for that is that the resolution of one claim doesn't necessarily determine the prevailing party because there are other claims yet to be decided. Between the same parties. Yes, exactly. And in this case it's undisputed that UPS did not advance a counterclaim against Mr. Hardenbrook, and in fact the district court observed that using its words, in reality, this is page 39 in the record, Hardenbrook had one claim pled under alternative theories of relief. The framework that we advanced in this case was the daisy manufacturing case. That's a case that's right on point in terms of the proper test. The byproduct of what happened here is what happened in Nguyen v. Bui. The district court lumped all the plaintiffs together, and the court of appeals in Nguyen v. Bui held its error to do that very thing for defendants. And there's no principle justification for applying a different rule as it relates to plaintiffs. The analysis should be a one-to-one analysis, and of course that led the court to come up with this prevailing side concept. And I searched again yesterday to determine if there's any Idaho case that were using the words prevailing side to express any legal concept. I couldn't find it. And UPS's response is, well, you can't throw cold water on the value of a successful defense. And they cite 18 Mile Ranch repeatedly in the brief. But what happened in 18 Mile Ranch? The case went to trial. The corporation defeated the plaintiff and avoided all liability. UPS can't make that claim here. One of the individual defendants got dismissed on a directed verdict, and the Idaho Supreme Court described that as achieving the most favorable outcome that it could possibly achieve. UPS can't make that claim here either. And UPS says, well, we defeated a motion. We defeated a motion to amend to allege punitive damages. We cited the cases to the court, Letnitch in particular, Holmes is another one, where the court doesn't do a prevailing party analysis on a motion-by-motion basis. The closest UPS gets is Adams v. Kruger. A careful study of Adams v. Kruger, there's a couple points to drive from that. The plaintiff in Adams v. Kruger didn't even ask for attorney's fees in the district court, so the Idaho Court of Appeals refused to address it on appeal. Number two, there wasn't even a motion to amend to allege punitive damages in Adams v. Kruger. There was somehow a claim brought advanced at the outset. So the case simply is not on point. We're asking this court to determine Mr. Hardenbrook as the prevailing party. Did the court have evidence of fees spent to advance Hardenbrook's claims as opposed to Orloff's, or are they together? Do they have to be apportioned? I say I'm out of time to answer your question. There was evidence, but the court didn't reach that issue because it stopped at determining the prevailing party. It concluded there was no prevailing party, so it never got to that. If we ended up saying that Mr. Hardenbrook should get a reasonable attorney fee, then of the plaintiff's fees, there'd have to be some apportionment of what fees were related to him. And conversely, if we also said that poor Mr. Orloff, if he loses, is not the prevailing party in UPS, if he isn't asked to pay a fee, then UPS would have to be able to apportion its fees, right? Your Honor, I agree. I think apportionment. And the district court didn't touch on those issues at all? No, it did not. Okay. Thank you. James. Morning, and may it please the Court. My name is Steve Mashaki. I represent UPS. Just to clarify, we have first the Orloff appeal, which is their appeal on the summary judgment ruling. In the Hardenbrook case, we are the appellant seeking the reversal of the front pay rulings. And then in the attorney fee appeal, it's a cross appeal. A conditional one. Let me take you first to the Orloff appeal and just get right to the heart of it. From my perspective of what I'm wondering is, why shouldn't we certify to the Idaho Supreme Court, whether it's protected activity, if a supervisor doesn't muzzle a subordinate who's engaging in protected activity? Why should our federal court decide that issue as opposed to asking Idaho to look at it first if they're willing to? I don't believe the court should certify that or the issue of whether there's a wrongful demotion claim in the first place here. The Idaho court has articulated a test for protected conduct. In other words, when counsel is arguing essentially bad intent is enough, that's certainly just not true. In the Thomas case, which is the chief case on which they rely, the court says that the public policy part of it has two parts. Is there a public policy that's sufficient to create an exception to at-will employment? And secondly, did the employee engage in protected conduct? And that's what you're getting at, Your Honor, that's sufficient to implicate that policy. And the court says there's repeatedly over and over again for a couple of decades, the court has said there's three species of protected conduct. There's performing an important public obligation. There is exercising a legal right or privilege. And there is refusing to commit an unlawful act. Now, the second two are not even alleged here. There's certainly no allegation of exercising a legal right or privilege by Mr. Orlov. And there's no allegation here of refusing to commit an unlawful act. Indeed, the only thing that Mr. Orlov was asked to do was to send Mr. Gooch home after he sent the email, and he did. He sent him home. He wasn't asked to do anything else specific, in this case, by his employer. So the only issue left is this issue of performing an important public obligation. And I think it's important to remember what the district court found the important public obligation to be here, and it was reporting. It was reporting a violation or potential violation of law. Now, there was no report here. Performing an important public obligation means some kind of affirmative act. And what the district court found here correctly is that Mr. Orlov knew nothing and did nothing. He didn't even know. He hadn't even seen these emails until after the complaint was filed in this case. He was not asked to do anything at the time, and what he said was, well, when I was fired, one of the things they threw in the mix was, you haven't been controlling your employees. Well, he didn't know that these complaints about DOT service violations were made. And so his only complaint really is, well, you know, geez, it's unfair to punish me for something that I didn't even know about, and how could I stop it if I didn't know about it? So it's really even one step removed from Muslim. But he did stop it if he knew about it. Pardon? But if he did stop it if he knew about it, that would be a violation of public policy. I agree with you, Your Honor. That would be an affirmative act performing a public obligation. That's right. And so if his superior, Moore, says you should have known about this, and had you known about this and not done anything, we would have fired you, that would have been a violation of public policy. I would disagree. In fact, Mr. Moore did not go that far, incidentally. That depends. That's a question of fact for the jury. Okay, fair enough. But what Mr. Orloff says is essentially, you know, I should have known about what he was doing, and then I should have said don't threaten to do this report. Moore says I should have known what they were doing, and I should have sat on them. I should have muzzled them, to use the word that our presiding judge has used. Right. And why isn't that the same thing as doing a public service? He's doing a public service if he finds out about it and won't submit to it. But if he's fired for not finding out about it, that's not against public policy? It's not, Your Honor. It doesn't have the sufficient nexus with the policy. This is a very narrow exception to employment at will, and there has to be specific conduct, and the court has articulated what the conduct is. It needs some affirmative conduct, and not knowing and not doing anything is not enough. I'd like to turn then to the issue of whether Idaho even recognizes the claim for wrongful demotion. Mr. Orloff's attorney has admitted, both in his briefs and here at argument, that Idaho has never recognized a claim for wrongful demotion. He said, however, that the Idaho Supreme Court has never been asked to look at a case that was something short of wrongful termination, but that isn't true. There is a case. It's the Smith v. Meridian School District case. It's a 1996 case of the Idaho Supreme Court, and in that case, the court was asked whether a wrongful failure-to-hire claim was cognizable under state law, whether there was a public policy exception that would apply in the failure-to-hire context, and the court said no, and the court specifically said, and it put the word termination in quotes when it said this. It said, you know, that a failure-to-hire was insufficient, that there couldn't have been a quote-unquote termination here because the person actually fulfilled their contract and then wasn't rehired, so there was no termination. The court, therefore, has specifically limited this tort to termination, so the Idaho law is not unclear, contrary to counsel's argument. Idaho law is clear that it only recognizes a tort of wrongful termination. You would agree there's been no Idaho case where a demotion has been found to be insufficient? I would agree with that, Your Honor. Furthermore, this Court should not create a novel state law claim, as in the Spada case. This Court specifically declined to do so, even though an employee was demoted in that case from a manager to a cashier. The Court said that's something that's left up to the Idaho Supreme Court. Likewise, in the Freeman case. I'm sorry, I'm getting some echo. In the Freeman case in the Tenth Circuit and also in the Ludwig case in the Seventh Circuit. The rationale for this is federalism. A court is sitting in diversity. Its job is to ascertain state law but not predict changes in state law, and accordingly it's inappropriate for this Court to say we're going to create a brand-new state law claim here for wrongful demotion. Counsel, I would tend to think you have a good argument on that, that we should not make up a new Idaho law. But if there's a gap in Idaho law, does that support our certifying the issue to the Idaho Supreme Court to say fill in the gap? There's no precedent that says whether or not such-and-such follows, so tell us. Right. No, Your Honor. First of all, I would disagree that there is a gap. There's no gap. Idaho law is clear. The Court has been asked at least once to expand this beyond termination and has said no. So I don't believe that there is a gap. Secondly, there's the separate issue. In other words, I guess you have a question with respect to that as well as whether you certify it, but there's the separate issue of whether there's protected conduct, and so that would be another reason. But we don't believe that there is any gap here. There is a case, and the Court was crystal clear and used the word termination and in itself put it in quotes and said that's what's required. So there's no unclarity about state law in this particular instance. I'd like to move then, if there are no more questions about Mr. Orlov, to the question of front pay, and this is again the ---- Could I ask you a practical question on the front pay? Absolutely, Your Honor. If we end up concluding that there's one or more problems with what was calculated, say that back pay was doubled up or included twice, or that we're not satisfied that a zero discount rate makes sense, what are we supposed to do then? Can we decide the case or do we remand it to the District Court to hold other evidentiary hearings or whatever? I think it depends on the issue and the basis on which you say we disagree. You're taking, let me take front pay first. We cited you in the 28-J letter, as you pointed out, the Watkins case. In that case, the Court said it is plaintiff's burden to prove the discount rate and to discount damages at present value as part of its burden of showing future damages with reasonable certainty. Counsel is simply incorrect that this case was somehow limited to its facts. I'm reading you from page 511 of the opinion. The plaintiff has the burden of production and persuasion throughout the trial. This includes the burden to prove in the case in chief the worth of the damages sought for the unpaid rent reduced to present value. So the Court did not limit this to its facts. The Court said this is part of the plaintiff's burden of proof. Now, if you agree with us on that particular point, it seems to me that the whole front pay award goes. This was their burden, and they didn't prove it. And in the Watkins case, the plaintiff said we have, you know, $1.8 million or so in future damages. And the Court said you get nothing. You get goose egg because you didn't prove up. That's not your damages. Your damages are the present value of those, you know, future losses. And you get zero. Well, the jury heard some evidence which counsel for the appellant characterizes or typifies as present value evidence by, I think it was named, was it Mr. Reinstein? Reinstein, yes. Was there any dispute as to whether he was allowed to give that opinion? There wasn't a dispute as to whether he was allowed to give it. So we're reviewing it on plain error, then? No. I think what you're looking at is you're looking at the Court's Rule 59E ruling and reviewing that for abuse of discretion. And what the Court said in its 59E ruling was that his opinions were, quote, unquote, not supported by basic economic principles and or methodologies. So the Court made a finding in its Rule 59E ruling that there is nothing there. So that's why I'm saying, getting back to your question, Judge Gould, that if you agree with us on that piece of it, I think you just throw out the whole $252,000 and you don't remand that. If the question, you know, if you don't agree with us on that and say, well, you know, we think this present value rate was speculation, that the plaintiffs just didn't bring it back, but, you know, we're not passing on the burden of proof somehow, and maybe there's something to remand. But I still don't see how you could do that. I think the front pay goes out altogether. On the question of the- When you talk about front pay, you're talking about the- The RSUs. The- The restricted stock. The restricted stock. Okay. I'm sorry. I'm sorry. There's three pieces to this. The overall front pay award was about $673,000. The restricted stock units was about $252,000 of that. And then I'm sort of taking these issues in a little bit. So when you say that there was no evidence on the 59E motion, the finding of the court was there was no economic substance to the determination by Reinstein as to the present value. Correct. Then if that is the burden of the plaintiff, then he's failed to prove. That's correct. He's failed in his proof. The way I read what the judge said, and I could be wrong on this, was that he had some reservations about Reinstein's present value theories, but that on the other side, he didn't think the UPS expert gave any reasoning at all in support of the number he used, so he was going to go with Reinstein. Yeah, I think that's fair, but I think they still lose there. In other words, what he was saying is, well, I don't agree with Reinstein, and basic economic principles and methodologies don't support what he did. And clearly they didn't, but because the defendant didn't come in and provide a discount rate that I think is valid, I'm just not going to, I'm going with the plaintiff, and that was improper. It's the plaintiff's burden. It wasn't our burden to come in and give the court an alternative rate that was sounder. With respect to the double counting, I think you need to look at Exhibit 280 to see exactly what happened there. If you have it up there, if you look at, now Scenario 2, excuse me, Scenario 2 is out, as you know. The court threw that out. Scenario 1, if you look at the last column, I'm sorry, the top row, the $149,615 was the value of lost wages and benefits. And when we filed our post-promotion, the remitted portion of our post-promotion, all of that was about front pay. There was no challenge to the back pay award there, and the court's analysis was all about front pay, not at all about back pay. So I think it's pure speculation for counsel to say that somehow the court was trying to, you know, throw in some more back pay here. Clearly the court was not. Well, and I think the question is, which figure do you use? Because the jury came up with its own $40,000 figure. So if we've double counted something, we have a $149,000 figure, and we have a $40,000 figure that was specifically found by the jury. So one of those is double counting. And the question is, which one do you subtract? You obviously would like the $149,000 subtracted. The plaintiffs would like the $40,000 subtracted. How can we resolve that question? I think you resolve it by saying, here's what the judge himself said he was doing. He was trying to figure out the maximum amount of front pay that was supported by the evidence. That's what he was doing in dealing with the remitted remotion we filed, and he expressly said that, and we agreed. And then what he awarded included $149,000 plus in back pay. So the error was in adding that additional back pay, and that's where the error was. The maximum amount supported by the evidence was about $523,000. So that's how you resolve it. You say the jury had already awarded back pay of $40,000. The judge was deciding how much front pay award and what the evidence supported as a maximum amount, and the maximum amount under their experts' own scenarios was $523,000. So that's what comes off. The $149,000 comes off, and I think that you can do that. I don't think you need to remand that issue to the court to try to figure out what the court was doing. The court told you, the judge told you exactly what he was doing. He was trying to figure out how much front pay to award, but he made a mistake in that process. So there's no lack of clarity here. I'd like to now turn, if I can, to what we think is the primary error in the front pay, and I know a lot of the focus has been on the restricted stock units and on the double counting of back pay. But the court here awarded 27 years' worth of front pay through age 66 to a healthy 38-year-old man who has two college degrees, 14 years of management experience, and had quickly gone out and found a comparable job. The standard here is that front pay is temporary in nature until an employee can find or does find comparable employment. And that's true not only under federal law, but it's true under Idaho law and under the law of the case here. The jury here was instructed with the Ninth Circuit, what was then the Ninth Circuit's front pay instruction, saying that front pay is temporary in nature and you need to limit it to the time when a plaintiff could or with reasonable efforts could or has found comparable employment. Since the jury was properly instructed here, then what's your burden? What do you have to show here in order for us to overturn a jury verdict? Well, I think that what we need to show is that the jury essentially didn't follow the instruction. And we're also looking, I think, in Rule 59E at what the trial court did, but the court abused its discretion in upholding that. Now, in the court's ruling, the court said two different things. When the court was addressing Scenario 2, the court said it's speculation that this plaintiff would have stayed here even until 2016. And so I'm not awarding the Scenario 2 damages. I'm not upholding that. But then when the court got to the length of the front pay award, the only thing that the court analyzed was Mr. Hardenbrook's intent. Even on that issue, the court went back and forth but said, I think there's sufficient evidence that Mr. Hardenbrook intended to stay. But that's it. The court didn't analyze at that point anymore whether he had already found comparable employment or whether with reasonable efforts he could do so. And that was there. That was an abuse of discretion. The facts are that Mr. Hardenbrook did, in fact, find comparable employment. He had a management job at UPS, a first-level management supervisor job. And at Battery Systems, he had a job of comparable status. He was the branch manager for all of southern Idaho. The court itself found that he had found a job with a comparable salary. And in making that determination, the court added in the cash portion of his bonus and said the $72,000 he's making at Battery Systems is comparable to the $73,000 in change he was making at UPS. Both counsels said there's no 401k or retirement plan. That's not true. Both at UPS and at Battery Systems, there's about a $2,000 match for 401k programs. Bonuses, there was evidence that there's better opportunity for bonuses at UPS, but Mr. Hardenbrook's supervisor at Battery Systems said if they exceed their targets that he's entitled to a percentage. I thought there was some evidence that Battery Systems wasn't doing as well as UPS couldn't pay the bonuses or wasn't likely to. Well, I don't know if it wasn't likely to. I think the issue was it hadn't in the past, but that if the projections were met or exceeded that there was a potential to, as a bonus, for the branch manager to get a percentage of that increase. If the jury was given the proper jury instructions, then why isn't the question of whether to give him front pay up to retirement a jury question? Because the court still on Rule 59E has to determine whether this award is speculative, whether it's speculative that, in fact, Mr. Hardenbrook would, in fact, have worked for 27 years at UPS. Now, maybe he had a subjective intent to, and that's all that the court found in that part of the opinion. The jury saw Mr. Hardenbrook. Mr. Hardenbrook said that he was going to work there until retirement, and the jury heard about Battery Systems and the comparative financial condition of UPS and Battery Systems, and they were properly instructed, and they could say that the probabilities were that Hardenbrook would work at UPS and that he might not make up his similar salary at Battery Systems. What's wrong with that? Well, what's wrong with that is it doesn't factor in his duty to mitigate. They were instructed on that. They were instructed on that. All right, so are you saying that the jury's determination was illogical, implausible, or without reference in the record? Yes, I am. But we've just gone over the evidence that there was in the record regarding the jury's seeing the demeanor of Mr. Hardenbrook and weighing his intent and also the comparative financial conditions of the two companies. So there is evidence in the record from which inferences can be taken, that he would have worked at UPS his whole life long, and that he might not have a job at Battery Systems because of their inferior financial conditions. Well, I think there's evidence in the record that supports the inference that he intended to work for 27 years. I don't think there's evidence in the record to support the notion that he would have worked for 27 years. In fact, again, the court itself said in determining whether to factor in this promotion that would have been awarded in 2016, I need to – it is speculative not only that he would have gotten a promotion, but the court also said that he would have still been working there. Well, life is speculative. Well, sure, but that's why we have a limitation on front pay. Counsel, it's pretty hard to argue that the jury's verdict is implausible and without evidence in the record when the numbers the jury came up with are found on exhibits in the record. That seems to be more sort of an argument that the district court should have never allowed this evidence in the first place, and therefore it's a problem at the district court's level rather than a problem with the jury, because he allowed the jury to make this judgment based on things that were in the record that are clearly there. So you can't argue that it's not in the record. It is in the record. If they come back with $25 million, you'd have a really good argument. It's hard to come back and say, well, when they came up with this figure at one point, you know, down to the dollars that an expert testifies that it's without support in the record. You're lost in the battle of the experts, and therefore you have to argue that the district court should never have allowed the evidence in the first place. It's very difficult for you to argue that there's no evidence in the record. I don't think that's available to us. There wasn't an evidentiary objection on that basis. But I guess the last thing I'd say about this issue is, I mean, that's been the considered decision of federal courts in every case that we cited, one to five years' worth of front pay until someone this young can find comparable employment. And we've talked a lot about O'Dell, but I think the more important case is really Hummer. And Hummer came after O'Dell. In Hummer, there was only a ruling by the judge in that it was a bench trial on the wrongful termination case, that's all. And the judge analyzed the issue as a question of whether the employee had found comparable employment. And the Hummer court never said, well, that's the wrong analysis somehow. What the court said was, well, in this particular case, you know, you can't extend this person out of contract and was fired before the termination of their contract. So you have to end the front pay at the end of that contract. The court said in this particular case, you can't go another year until the person would have found comparable employment. So I think that Hummer indicates that the court does embrace federal law on front pay, and that for a 38-year-old healthy person who is educated and has found other employment, it's inappropriate to provide a lifetime front pay award. I have three minutes left to do attorney fees. There are three issues I'd like to bring up here in terms of the court's consideration of the overall action. The case that is most on point is the international engineering case from Idaho 1981. Two plaintiffs, two defendants. Two corporations on the plaintiff's side involved in a joint venture. Two corporations on the defense side involved in a joint venture. Three different contracts. The plaintiffs each prevailed on a contract. One of the defendants prevailed on a third contract. And the trial court said, no prevailing party here. Looked at the mix of claims and results. And we think that the same analysis applies here. It's not just that plaintiffs chose to sue together. They had the same three theories. They had overlapping facts. The punitive damages claim wasn't just defending a motion. If you look at the depositions in this case, a tremendous amount of it. I assume, though, that your firm isn't touting your success in the Hardenbrook case as among the firm's great defenses. I assume that's not appearing in some brochure being used by the law firm, right? That's correct, Your Honor. Okay. Pretty hard to argue that you won Hardenbrook. I think that's fair to say, Your Honor. But we think, again, that the mix of facts here shows that. You may have a good argument that between Hardenbrook and Orloff, you're going to net this thing out. But pretty hard to argue that if this had been Hardenbrook only versus UPS, that Hardenbrook would not be entitled to attorney's fees. There's one case I'd like you to consider in that regard, and that's Adams versus Kruger. Defendants, two defendants, cut liability down by 49 percent, prevailed on punitive damages. Otherwise, lost the only claim in the case. Court held no attorney fees for either side. Here, again, the punitive damages issue was huge. Defendants, the plaintiffs interviewed 17 witnesses, including many people who were never even involved in the case, to try to prove up this pattern of hours of service violation. So the punitive damages issues was enormous and could potentially have troubled the damages here. And the court in the nailing case indicated the punitive damages is considered a separate claim, not just kind of derivative of something else. So there was a significant victory there by UPS in terms of liability. Finally, you're right, we do have a cross appeal here. So if there were to be a reversal of this issue under our cross appeal, I think it's essentially admitted that we are entitled to fees against Mr. Orloff. And what does your, do your firm's records segregate the time spent defending against Orloff as opposed to defending against Hardinbrook? Or would there have to be an allocation of some kind? I think there'd have to be some kind of allocation and some, with respect to some of the fees. And we did provide the court below with the fees that we felt that were allocable to, I believe the two different plaintiffs. But I think there'd have to be some allocation. Many of these depositions, again, were joint depositions. What does the record show on that issue, just to put it in perspective? I'm sorry, Your Honor. What does the record show were the scope of your fees defending against Orloff and defending against Hardinbrook? I'm sorry, I don't have that answer for you. It would be in our, we filed our own separate motion for attorney fees. So in addition to defending against the motion brought by Mr. Hardinbrook, we filed a motion for fees as well. And I don't have the numbers off hand. My primary position is that if we look at the cases that you've mentioned in your brief and that argument, we could conclude there's no prevailing party here. That's correct. Even though Mr. Hardinbrook gets a large award.  Thank you, Your Honor. I just want to make a couple of points quickly on what seemed to be an issue on the Hardinbrook case on the net discount rate. I think if you look at Mr. Reinstein's testimony, it's in the record, about how he developed that net discount rate. If you can't conclude from that that a reasonable jury could accept that testimony and a war and render its verdict accordingly, I have a hard time believing that that's an appropriate statement of the law. In fact, both experts, the plaintiff's expert and the defense expert, both did the same thing in developing the net discount rate. The only difference is our expert used 50 years of comparable companies, used projections, and used UPS's own performance, and then subtracted cost of capital. It wasn't just future growth of the stock. They were doing the same thing. They were talking about something other than discount for present value. But that's all right. What you're saying is... I think sound economic theory indicates that that's how you discount the present value stock, future growth of stock and the present value of the future growth of stock, of what that's going to be worth, and what the present value of that future worth of stock is. You subtract the cost of capital. Otherwise, if you just factored growth, you would have had a negative 8% to 9% net discount rate because you would have just factored future growth. And that would have been, this is what Darrell's stock is going to be worth in the future. It's going to grow at a rate of 8% to 9%. But he didn't stop there. He subtracted the cost of capital to bring it back to the present, the present value of that future growth of his stock. And I think that's sound economic theory because both experts testified to it. And there never was a Daubert hearing to challenge the scientific reliability... That's your first point. Yeah, I think so. Thank you. Now, on the Orloff case, opposing counsel's primary point is that there's two obligations in order to satisfy the public policy exception to the at-will doctrine. First, there must be the motivation of the employer must be something that violates the public policy of the state. I don't think there's any question about that in this case. There was a genuine issue of material fact. And secondly, he argues that you also must demonstrate some kind of conduct. And I would submit if you read those cases, the court has identified summaries, the types of things that have resulted in the past in public policy exceptions. The court has never said that the failure or refusal to do something is not the performance of an important public obligation. And in fact, if you look at the Jackson case, Jackson versus Minidoka County, 563 P2D 54, that's when the court expressly recognized a public policy exception to the at-will doctrine. Back in 1977, and in doing so, the court recognized the Tammany case from California, which involved the refusal or failure to do something that would violate the public policy of the state. False testimony. They also identified a New Hampshire case where the female employee refused to date a supervisor in identifying the type of public policy, the type of conduct that would satisfy the public policy exception under Idaho law. So there's plenty of case authority in Idaho that demonstrates that the refusal or failure to do something is just as protected as the report itself. And there simply is no policy justification for why there should be a distinction. Once again, the statement of the court is in the employment realm, the statement to employers is don't violate the public policy of this state in your dealings, your employment decisions with your employees. Mr. Rossman, give me that Idaho case. You say 1977, the Idaho case cited Tammany and the dating issue? Yes, Jackson versus Minidoka School District. I believe it was the Tammany case. It was the false testimony case, which was the Tammany case, 563 P2D 54, 1977. Now, opposing counsel cites to the Smith case, Smith versus Napa School District, I believe, one of the school districts. But they cite to the Smith case to argue that, and he described it as a failure to hire case. Well, it was a little different than that. What the court addressed was whether or not the refusal of an employer to rehire an employee could violate the public policy of the state. And I guess I would point to the court that there's no employment relationship. And the court expressly has refused to extend the public policy exception outside the employment context. And that's why they didn't extend it in Smith. But that's a far cry from deciding whether or not the refusal to suppress a report can be something that satisfies the public policy exception. And it's a far cry from deciding whether or not. Where's the evidence that Orloff refused to suppress the report if he didn't know about it? Well, and that's confusing. And I'm going to run out of time if I can answer the question. Take extra time. You can answer Judge Baez's question. The first report was in late December of 2005. Mr. Orloff testified he didn't know about the report when it was made. But he was called a week later and read the Riot Act and told him that he was failing to control his employees. Then seven months later, so at least as of the end of December, Mr. Orloff was well aware of that prior report. So then in July of 2006, Mr. Hardenbrook submits a business ethics questionnaire and again hits this issue about them violating hours of service regulations. Mr. Moore, the district manager, comes to Orloff and says, look at this, you see, he did it again. You're failing to control your employees. It's out of your hands now. And two weeks later, Robert Orloff is demoted two levels from the district manager of the entire state of Idaho down to an on-road supervisor and one of the things that is told to him by Rich Moore is that you failed to control Mr. Hardenbrook and Mr. Gooch. If that's not a public policy exception under Idaho law, given the prior case authority that's before this court, I would submit that it's form over substance because you can't tell an employer that you've been violating the public policy of the state. All you want, as long as all you do is demote the employee rather than discharge. Thank you. It's very nicely argued. You didn't have other comments, I don't think. All of you have made nice arguments. We will take this under submission. The Orloff case is submitted. We adjourn until tomorrow. All rise.
judges: Gould, Bybee, Bea